**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TENNESSEE GAS PIPELINE COMPANY, | |
| Plaintiff, | CIVIL ACTION NO. 3:CV-11-028 |
| v. | (JUDGE CAPUTO) |
| PERMANENT EASEMENT FOR 1.7320 ACRES AND TEMPORARY EASEMENTS FOR 5.4130 ACRES IN SHOHOLA TOWNSHIP, PIKE COUNTY, PENNSYLVANIA, TAX PARCEL NUMBERS 49.00-1-15, 49.00-1-19, 49.00-1-20 AND 62.00-01-57, *et al.*, | |
| Defendants. | |

## MEMORANDUM

Plaintiff Tennessee Gas Pipeline Company ("Tennessee") commenced this condemnation action under the Natural Gas Act, 15 U.S.C. § 717 *et seq*., to acquire a permanent easement and temporary easements (the "Rights of Way") on property owned by Fox Hollow Estates, L.P. ("Fox Hollow") in Shohola Township, Pike County, Pennsylvania to construct new pipeline and compressor facilities and modify existing facilities on its existing 300 Line as part of Tennessee's 300 Line Project (the "Project").  Tennessee and Fox Hollow agreed to Tennessee's immediate possession of the Rights of Way to construct the Project upon the posting of a bond as security for just compensation.  After an order was entered granting Tennessee possession of the Rights of Way upon the posting of a bond, Tennessee posted a bond to perfect its possession of the Rights of Way.  Tennessee has since completed construction of the Project on the Property.  The only unresolved issue in this action is a determination of just compensation owed to Fox Hollow by Tennessee. A two day non-jury trial on this issue was held in November 2013.  Set forth herein are the

Court's factual findings and legal conclusions pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. Background

### A.     Relevant Factual Background

Defendant Fox Hollow owns 298.97 acres of real property in Shohola Township (the "Township"), Pike County, Pennsylvania, described in a Deed dated May 23, 2005, recorded in the Office of Recorder of Deeds of Pike County at Book 2112, Page 1341 (the "Deed"), and known as Tax Parcel Numbers 49.00-1-15, 49.00-1-19, 49.00-1-20, and 62.00-01-57 (the "Property").   By way of an agreement granting an easement in 1955 to Tennessee's predecessor, Tennessee Gas Transmission Company, Tennessee owned an existing easement and right of way on the Property.   That easement is fifty (50) feet wide and grants Tennessee the right to operate and maintain a single pipeline.

Fox Hollow acquired the Property on May 23, 2005 for $1,875,000.00 for purposes of subdividing it and selling free-standing single homes.

On May 14, 2010, Tennessee received a Certificate of Public Convenience and Necessity from the Federal Energy Regulatory Commission ("FERC"), Docket No. CP09-444-000, 131 FERC ¶ 61,140 (2010) (the "FERC Order"), to construct a new pipeline and compressor facilities and modify existing facilities on its existing 300 Line as part of Tennessee's 300 Line Project.   In order to construct the Project, Tennessee required additional permanent right of way and temporary workspace on the Property.

Tennessee thus commenced this condemnation action seeking to condemn permanent rights of way and easements, twenty-five (25) feet in width containing 1.732 acres, and temporary easements of 5.413 acres (the "Rights of Way").   The Rights of Way were necessary to construct, operate, and maintain the pipeline approved in the FERC Order for the Project.

2

The Rights of Way are adjacent to or co-existing with the existing fifty (50) foot wide easement on the Property.  As stated, the Rights of Way include an additional permanent right of way and easement of 1.732 acres, temporary workspace and easements of 5.413 acres, and an overlay easement for the new second pipeline in the pre-existing easement area of 1.886 acres.

As part of its application for a certificate of public convenience and necessity for the Project, Tennessee submitted alignment sheets depicting the pipeline construction route.  The Project included the construction of eight pipeline loop segments.  The Property is on the construction route for Loop 323 as reviewed and approved by the FERC.

Pursuant to a stipulation between Tennessee and Fox Hollow, the Court entered an order granting Tennessee possession of the Rights of Way upon the posting of a bond.  Tennessee subsequently perfected its right to possession of the Rights of Way, and a certified copy of the order granting Tennessee possession of the Rights of Way was recorded in the Office of the Recorder of Deeds for Pike County, Pennsylvania as Instrument 201300000810 at Deed Book 2409 Page 2512.  As a result of the taking of the Rights of Way, Tennessee's permanent easement and right of way on the Property increased from fifty (50) to seventy-five (75) feet in width and now contains to two pipelines.

As part of its Implementation Plan for construction of the Project, Tennessee submitted an Environmental Construction Plan for Pennsylvania to the FERC.  The FERC reviewed and approved the Environmental Construction Plan for Pennsylvania by issuing a Notice to Proceed with construction in Pennsylvania.  The restoration that Tennessee is required to perform by the FERC on the Property is set forth in the Environmental Construction Plan.

Tennessee has since completed construction of the Project on the Property.  In addition, Tennessee has completed its restoration work on the temporary easement.  As

3

such, just compensation for the taking of the Rights of Way is ripe for determination. Accordingly, a non-jury trial on just compensation was held on November 20 and 21, 2013.

## B.    Procedural History

On January 5, 2011, Tennessee filed a Complaint in Condemnation in this action seeking to condemn permanent rights of way and easements, twenty-five (25) feet in width containing 1.732 acres, and temporary easements of 5.413 acres.  On February 28, 2011, Tennessee and Fox Hollow entered into a Stipulation Regarding Notice Pursuant to Fed. R. Civ. P. 71.1(e)(1) and Possession (Doc. 17), whereby the parties agreed to the entry of an order granting Tennessee immediate possession of the Rights of Way to construct the Project upon the posting of a bond as security for just compensation.  Fox Hollow also reserved "the right to challenge the amount of just compensation being offered by Tennessee and present evidence at the trial on compensation[.]"  On March 4, 2011, the Court entered the stipulated order granting Tennessee possession of the Rights of Way upon the posting of a bond. (Doc. 19.)  Tennessee posted a bond on March 15, 2011 to perfect its right to possession of the Rights of Way. (Doc. 20.)

On May 10, 2013, Tennessee filed a Motion to Open Case to Determine Just Compensation. (Doc. 22.)  Tennessee's motion was granted, and the case was re-opened for determination of just compensation. (Doc. 26.)

Following the close of discovery, and prior to trial, the parties filed motions *in limine*. (Docs. 30; 32; 34.)  In particular, both Tennessee and Fox Hollow filed motions seeking the exclusion of evidence not relevant to the determination of just compensation. (Docs. 30; 32.)  Tennessee advanced the position that federal law governs the determination of just compensation in this action, while Fox Hollow argued for application of Pennsylvania law to determine the amount of compensation due for the taking of the Rights of Way.  Because the matter was being heard without a jury, the parties' motions were deferred to trial.

4

**C.    Trial Testimony**

    **1.    Testimony Presented by Fox Hollow**

At trial, Fox Hollow presented the testimony of Stephen Sameroff ("Sameroff"), the principal of Fox Hollow, John McChesney ("McChesney"), a real estate appraiser, Michael Weeks ("Weeks"), a civil engineer, and James Leary ("Leary"), a consulting forester.

According to Sameroff, Fox Hollow acquired the Property on May 23, 2005 for $1,875,000.00 for purposes of subdividing it and selling free-standing single homes. Following the purchase of the Property, Fox Hollow had a sketch plan prepared and the plan was submitted to the Township.  Fox Hollow also had a major preliminary subdivision plan prepared that was submitted to the Township.   Additionally, soil erosion and sedimentation control plans were prepared and submitted to the Township and the Department of Environmental Protection.  A non-point discharge elimination system permit was submitted to the Pike County Conservation District, and sewage planning was submitted to the Department of Environmental Protection.

Sameroff testified that Fox Hollow stopped pursuing the subdivision project in 2007 or 2008 because of the recession.  Moreover, Sameroff testified that Fox Hollow never received preliminary or final subdivision approval for the Property, nor did Fox Hollow ever receive preliminary or final land development approval for the Property.

In view of Tennessee's taking of the Rights of Way, Sameroff testified, in his opinion as landowner of the Property, that Fox Hollow incurred $300,000.00 in damages.  Sameroff attributed the damages to additional costs to remediate the Property, re-engineer the Property, and develop new storm water plans.  Sameroff also testified that the addition of a second pipeline diminished the value of the Property exponentially.

Fox Hollow also presented the testimony of McChesney, a real estate appraiser.  In appraising the Property, McChesney applied a sales comparison approach.  McChesney

concluded that fair market value of the Property before the taking of the Rights of Way was $1,495,000.00, which amounted to a per acre value of $5,000.00.  McChesney applied the same process to the Property after the taking, and he concluded that the fair market value of the Property after the taking of the Rights of Way was $1,406,000.00.  The per acre value after the taking, according to McChesney, was $4,700.00.  Thus, McChesney found the fair market value of the Property to have decreased by $89,000.00 as a result of the taking of the Rights of Way.   Of that $89,000.00, McChesney attributed $69,000.00 to indirect damages and $20,000.00 to direct damages.  In making his evaluation, McChesney did not consider the cost of re-engineering the Property, building new crossings over the pipeline, or restoring the temporary workspace.

Fox Hollow next presented the testimony of Weeks, a civil engineer.  Weeks testified that as a result of the taking of the Rights of Way, it would cost Fox Hollow $34,930.00 to construct a crossing over the new pipeline.  Thus, he estimated that the cost of two additional crossings over the new pipeline would be $69,860.00.  Weeks also estimated that it would cost Fox Hollow $32,000.00 to re-configure and re-engineer the plans to accommodate Tennessee's expanded easement.

Lastly, Leary testified with respect to a timber appraisal he prepared for Fox Hollow. According to Leary, the merchantable value of the timber removed from the Property was $6,325.72.  Leary further estimated that 155 trees would be needed to replace the removed trees, which he concluded would cost $6,885.00.  And, at a replanting cost of $290.00 per tree, Leary estimated the cost of replanting the temporary workspace to be $44,950.00. Thus, Leary testified that Fox Hollow suffered $58,160.72 in damages.

### 2.    Testimony Presented by Tennessee

Tennessee presented testimony from two witnesses at trial, Daniel Gredvig ("Gredvig"), director of right of way for the eastern division of Kinder Morgan, and Richard

Drzewiecki ("Drzewiecki"), a real estate appraiser.

Gredvig testified that Tennessee has completed construction on the Property.   In addition, Tennessee has completed its restoration work on the temporary workspace. Gredvig testified that prior to Tennessee's use of the temporary easement it was fully wooded.   Now, however, despite having completed restoration, there are no trees on the temporary easement.   Rather, Tennessee graded, seeded, and mulched the temporary workspace.   Moreover, Gredvig indicated that after construction is completed and the temporary easement restored, Tennessee is responsible only for the maintenance of the permanent easement.

Tennessee also presented the testimony of Drzewiecki, a real estate appraiser. Drzewiecki was retained by Tennessee to perform an analysis of comparable sales in connection with Tennessee's 300 Line Project.   According to Drzewiecki, the fair market value of the Property before the taking of the Rights of Way was $1,439,200.00, resulting in a per acre price of $4,815.00.   After the taking of the Rights of Way, Drzewiecki determined the fair market value of the Property to be $1,421,100.00, amounting to a price of $4,755.00 per acre.   Thus, Drzewiecki concluded that the difference in the fair market value of the Property before and after the taking was $18,100.00.   And, Drezwiecki attributed the entire $18,100.00 to direct damages, as he found that there was no indirect damages as a result of the taking of the Rights of Way.   Instead, he testified that the indirect damages occurred in 1955 when the first pipeline was placed across the Property, because, based on the information available, he had no proof that severance damages resulted from the taking of the additional twenty-five (25) foot easement.

**D.      Post-Trial**

At the conclusion of the trial, both parties were given the opportunity to file post-trial submissions.   Both parties timely submitted proposed findings of fact and conclusions of

law. (Docs. 58; 62.)  Having considered the testimony of witnesses and evidence admitted at trial, as well as the submissions of the parties, I will analyze the evidence and the law and make Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## II. Legal Standard

Rule 52 of the Federal Rules of Civil Procedure provides, in pertinent part:

(a) **Findings and Conclusions.**

(1) **In General.**  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its legal conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58. . . .

Fed. R. Civ. P. 52(a)(1).  Pursuant to Rule 52(a), the Court's decision must "be supported by subordinate factual findings." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969)).  "This is a mandatory requirement." *In re Frescati Shipping Co.*, 718 F.3d 184, 196 (3d Cir. 2013).  While the Court is not permitted to "view the evidence through a particular lens or draw inferences favorable to either party," *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010) (citing *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006); *Giant Eagle, Inc. v. Fed. Ins. Co.*, 884 F. Supp. 979, 982 (W.D. Pa. 1995)), the Court should "make determinations of witness credibility where appropriate." *Clark Bldg.*, 618 F.3d at 273 (citing *Parker v. Long Beach Mortg. Co.*, 534 F. Supp. 2d 528, 535 (E.D. Pa. 2008); *Falter v. Veterans Admin.*, 632 F. Supp. 196, 200 (D.N.J. 1986)).

## III. Discussion

### A.   The Natural Gas Act

Tennessee commenced this condemnation action under the Natural Gas Act, 15 U.S.C. § 717 *et seq*.  As set forth in § 717(a) of the Natural Gas Act, "it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is

affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest." 15 U.S.C. § 717(a).  Relevant to the determination of just compensation is § 717f(h) of the Natural Gas Act, which provides:

> When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: Provided, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

15 U.S.C. § 717f(h).

**B.     Applicable Law for Determining Just Compensation**

As indicated, the parties dispute whether state or federal law governs the determination of just compensation in condemnation actions brought pursuant to the Natural Gas Act.  The dispute arises pursuant to the Natural Gas Act's provision providing that "[t]he practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: . . ." 15 U.S.C. § 717f(h).  Both parties acknowledge that neither the Supreme Court nor the United States Court of Appeals for the Third Circuit has determined whether state or federal substantive law governs the determination of compensation owed in condemnation proceedings under the Natural Gas Act.

### 1.    Fox Hollow's State Substantive Law Arguments

According to Fox Hollow, the "practice and procedure" clause in § 717f(h) mandates that the substantive law of the state in which the condemned property is located governs the determination of just compensation.  Thus, in this action, Fox Hollow contends that Pennsylvania law provides the proper standard for computing compensation payable by Tennessee.  Fox Hollow cites the Sixth Circuit's decision in *Columbia Gas Transmission Co. v. An Exclusive Natural Gas Storage Easement*, 962 F.2d 1192 (6th Cir. 1992) and the Fifth Circuit's decision in *Mississippi River Transmission Corp. v. Tabor*, 757 F.2d 662 (5th Cir. 1985), as support for its position that state law governs compensation determinations in condemnation actions under the Natural Gas Act.

Fox Hollow relies heavily on the Sixth Circuit's *Columbia Gas* decision. *See Columbia Gas*, 962 F.2d at 1194.  In *Columbia Gas*, the Sixth Circuit addressed, as a matter of first impression, "whether compensation for a condemnation action brought pursuant to § 717f(h) of the Natural Gas Act should follow state law." *Id*. at 1196.  And, in addressing that issue, the court considered whether "it should fashion a federal common-law rule as the federal standard or instead, adopt the law of the state in which the condemned property is situated." *Id*. at 1196-97.  In determining whether to adopt state law or fashion a federal standard, the Sixth Circuit looked at three considerations established by Supreme Court precedent: (1) the need for a nationally uniform body of law; (2) whether the application of state law would frustrate the specific objectives of the federal program at issues; and (3) the extent to which application of a federal rule would upset commercial relationships predicated on state law. *See id*. at 1195-96 (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29, 99 S. Ct. 1448, 59 L. Ed. 2d 711 (1979)).

The Sixth Circuit held that "although condemnation under the Natural Gas Act is a matter of federal law, § 717f(h) incorporates the law of the state in which the condemned

property is located in determining the amount of compensation due." *Columbia Gas*, 962 F.2d at 1199.  To reach that holding, the *Columbia Gas* court began its analysis with the text of § 717f(h).  Although recognizing that it "is arguably open to question" whether the "practice and procedure" clause of § 717f(h) should be read as incorporating the substance of state law for determining just compensation, the court stated that it was "inclined to read the statute as raising a strong presumption that state law does provide the proper measure for such determination, . . ." *Id*. at 1197.

Next, the court noted that the only court of appeals to address whether § 717f(h) incorporates state law as the federal standard, the Fifth Circuit in *Tabor*, summarily concluded that state law be adopted as the federal rule. *See id*.  However, viewing *Tabor* in the context of an earlier Fifth Circuit decision construing the Federal Power Act, *Georgia Power Co. v. 138.30 Acres of Land (Sanders)*, 617 F.2d 1112 (5th Cir. 1980) (en banc), *cert. denied*, 450 U.S. 936, 101 S. Ct. 67 L. Ed. 2d 372 (1981), the Sixth Circuit found those decisions pointed to the application of state law to determine just compensation under § 717f(h). *See Columbia Gas*, 962 F.2d at 1197-98.

Lastly, the *Columbia Gas* court set forth the following reasons which it found supported adopting state law as the federal standard to govern compensation determinations under § 717f(h): (1) property rights have traditionally been defined by state law; (2) incorporating state law as the federal standard would not frustrate the specific objectives of the Natural Gas Act; and (3) it was unnecessary to fashion a nationally uniform rule of compensation for private parties exercising their power of eminent domain under the Natural Gas Act. *See id*. at 1198-99.  And, while not deciding whether legislative history is properly considered under the *Kimbell Foods* analysis, the Sixth Circuit indicated that the legislative history of § 717f(h) was intended to mirror the parallel provision of the Federal Power Act. *See id*. at 1199.

11

Fox Hollow also cites *Tabor* to support its position that state law should be applied in determining just compensation in this action.  In *Tabor*, the Fifth Circuit stated: "15 U.S.C. § 717f(h) requires that the practice and procedure in federal expropriation proceedings conform as nearly as possible with the practice and procedure to be followed in a state court action in the state where the property being expropriated is situated.  Therefore, Louisiana law controls the issues in this case." *Tabor*, 757 F.2d at 665 n.3 (internal citation omitted).

Fox Hollow, applying the *Columbia Gas* court's reasoning, contends that the Fifth Circuit's decision in *Tabor*, viewed in the context of *Georgia Power*, strongly supports the application of state substantive law to the determination of just compensation under § 717f(h).  At issue in *Georgia Power* was "whether compensation should be determined under federal law or under the law of the state where the condemned property is located when a licensee of the Federal Energy Regulatory Commission (the Commission) exercises the power of eminent domain in federal court as authorized by Section 21 of the Federal Power Act, 16 U.S.C. § 814." *Georgia Power*, 617 F.2d at 113 (internal footnote omitted). Although the en banc *Georgia Power* court acknowledged the importance of federal interests in issues arising under the Federal Power Act, the court found those interests insufficient to justify the displacement of state law in determining compensation a private licensee must pay a landowner in a condemnation action under Section 21. *Id*. at 1118. And, while "federal rules have been applied to the determination of just compensation in federal condemnation cases where the United States is a party condemning and paying for the land," the court found those cases unpersuasive in the context of a "Section 21 proceeding by a licensee where the nature of the federal interests involved differs markedly from the nature of the federal interests involved where the United States is the condemnor."

*Id*. at 1119-20.[1]  A majority of the *Georgia Power* court thus concluded:

> [A]bsent a showing of legislative intent to the contrary, considerations of federalism warrant a preference for adoption of state law as the federal rule. We do not find the showing of federal interests and the effects thereon of applying state law sufficient to overcome that preference in this case.  Thus, we are led to the conclusion that the law of the state where the condemned property is located is to be adopted as the appropriate federal rule for determining the measure of compensation when a licensee exercises the power of eminent domain pursuant to Section 21 of the Federal Power Act.

*Id*. at 1124.

Lastly, Fox Hollow argues that the majority of district courts that have addressed the issue of whether state or federal law should be applied to compensation determinations in proceedings brought under the Natural Gas Act have applied state law. *See, e.g., Texas Gas Transmission, LLC v. 18.08 Acres,* No. 08CV240, 2012 WL 6057991, at *5 (N.D. Miss. Dec. 6, 2012) (citing *Georgia Power*); *Perryville Gas Storage, LLC v. Dawson Farms, LLC*, No. 11-1883, 2012 WL 5499892, at *7 (W.D. La. Nov. 13, 2012) (citing *Tabor*); *Rockies Express Pipeline LLC v. 77.620 Acres More or Less*, No. 08-cv-3127, 2010 WL 3034879, at *2 (C.D. Ill. Aug. 3, 2010); *Maritimes & Northeast Pipeline, L.L.C. v. .714 Acres of Land, More or Less*, No. 02-11054, 2007 WL 2461054, at *2 (D. Mass. Aug. 27, 2007) ("Massachusetts law of eminent domain governs the substantive determination of just compensation in a condemnation action commenced under the Natural Gas Act.").

### 2.    Tennessee's Federal Substantive Law Arguments

Tennessee, on the other hand, argues that federal substantive law governs the determination of compensation in condemnation actions under the Natural Gas Act.  As stated by Tennessee, while the Supreme Court and the Third Circuit have yet to address

---

[1]    The dissenting judges in *Georgia Power*, however, noted that they "fail[ed] to perceive any sound reason to distinguish between condemnation proceedings brought by the United States and those in which it authorizes its power to be used by its statutory licensee for a federal public purpose, . . ." *Georgia Power*, 617 F.2d at 1129 (Rubin, J., dissenting).

whether federal law applies to compensation determinations in actions brought pursuant to the Natural Gas Act, "courts in the Third Circuit have applied federal law in every case involving the determination of compensation in a condemnation pursuant to the federal power of eminent domain." (Doc. 31, 7 (emphasis omitted).)  According to Tennessee, federal law governs the determination of just compensation under § 717f(h) based on the Supreme Court's decision in *United States v. Miller*, 317 U.S. 369, 63 S. Ct. 276, 87 L. Ed. 336 (1943).

The Supreme Court granted certiorari in *Miller* to address "questions respecting standards for valuing property taken for public use" in relation to the condemnation of land in California by the United States for tracks of the Central Pacific Railroad. *See Miller*, 317 U.S. at 370-71, 63 S. Ct. 276.  According to the Court, "just compensation" as used in the Fifth Amendment, requires the "equivalent in money of the property taken," as the owner is to be put in the same pecuniary position as he or she would have occupied had the property not been taken. *Id*. at 373, 63 S. Ct. 276.  Emphasizing that an owner of condemned property is to receive "no more than indemnity for his loss," the Court stated that "although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor as distinguished from others who may or may not possess the power to condemn, must be excluded as an element of market value." *Id*. at 375, 63 S. Ct. 276.  The Court also noted, however, that "[i]f only a portion of a single tract is taken the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract.  Such damage is often, though somewhat loosely, spoken of as severance damage." *Id*. at 376, 63 S. Ct. 276.  Lastly, the *Miller* Court rejected the argument that state law should apply to the determination of compensation because the federal statutes at issue, 40 U.S.C. §§ 257-258

14

(1940)[2] and 33 U.S.C. § 591 (1940), required only that "in condemnation proceedings, a federal court shall adopt the forms and methods of procedure afforded by the law of the State in which the court sits.  They do not, and could not, affect questions of substantive rights, -such as the measure of compensation,- grounded upon the Constitution of the United States." *Id.* at 379-80, 63 S. Ct. 276.

The following year, the Third Circuit applied *Miller* in holding that federal law, and not state law, applied to the determination of compensation in a condemnation proceeding brought by the United States against land in Pennsylvania. *See United States v. Certain Parcels of Land in Phila.*, 144 F.2d 626, 628 (3d Cir. 1944).  Since *Miller*, the Third Circuit and district courts in the Third Circuit have applied federal law in condemnation proceedings that occurred pursuant to the federal power of eminent domain. *See, e.g., United States v. 412.93 Acres of Land*, 455 F.2d 1242 (3d Cir. 1972); *United States v. 60.14 Acres of Land*, 362 F.2d 660 (3d Cir. 1966); *United States v. 13.98 Acres*, 702 F. Supp. 1113, 1116 (D. Del. 1988); *United States v. 15.3 Acres of Land in Scranton*, 154 F. Supp. 770, 783 (M.D. Pa. 1957).

### 3. Federal Substantive Law Applies to Compensation Determinations

In this case, federal substantive law will be applied to determine the compensation owed by Fox Hollow to Tennessee for the taking of the Rights of Way.  In contrast to the authority cited by Fox Hollow, I am of the view that federal law governs the substantive determination of just compensation in a condemnation action commenced under the Natural Gas Act.  Significantly, the Supreme Court in *Miller* held that federal law governs the

---

[2]     40 U.S.C. § 258 (1940) provided: "[t]he practice, pleadings, forms and modes of proceedings in causes arising under the provisions of section 257 of this title shall conform, as near as may be, to the practice, pleadings, forms and proceedings existing at the time in like causes in the courts of record of the State within which such district court is held, any rule of the court to the contrary notwithstanding."

determination of compensation in federal condemnation proceedings because the measure of compensation is a question of substantive right "grounded upon the Constitution of the United States." *Miller*, 317 U.S. at 379-80, 63 S. Ct. 276. And, since *Miller* was decided, the Third Circuit, as well as district courts in the Third Circuit, have applied federal law in determining compensation in condemnation actions commenced pursuant to the federal power of eminent domain. *See, e.g., 412.93 Acres of Land,* 455 F.2d at 1242; *60.14 Acres of Land,* 362 F.2d at 660; *13.98 Acres,* 702 F. Supp. at 1116; *15.3 Acres of Land in Scranton*, 154 F. Supp. at 783. These considerations, in my view, strongly support the application of federal substantive law to determine compensation owed in condemnation proceedings commenced pursuant to the Natural Gas Act.

Furthermore, I am not swayed by the reasoning of the courts that have applied state substantive law to determine compensation in actions brought under the Natural Gas Act. The *Tabor* court's analysis failed to account for *Miller*, and, instead, the Fifth Circuit simply indicated in a footnote that state law applied to determine whether the trial court's award of compensation was just compensation. *See Tabor*, 757 F.2d at 665 n.3.

Likewise, I am not persuaded by the reasoning employed by the *Columbia Gas* court or its reliance on *Georgia Power* to support application of state substantive law to determine just compensation in condemnation proceedings brought under the Natural Gas Act. I find it difficult to agree that the "practice and procedure" clause of § 717f(h) raises a strong presumption that state law provides the proper measure for determining just compensation. *See Columbia Gas*, 962 F.2d at 1197. As the First Circuit has commented: "[p]erhaps surprisingly, several circuits have read the phrase 'practice and procedure' to encompass state substantive law as well as formal practice." *Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land, More or Less*, 318 F.3d 279, 282 n.1 (1st Cir. 2003) (but declining to "pursue this interesting subject in the present case").

16

Additionally, I fail to see a good reason to differentiate between condemnation proceedings brought by the United States and those in which the United States authorizes its condemnation power to be used by a private entity under the Natural Gas Act. *Georgia Power* and *Columbia Gas*, as stated by another district court, "rely in part on a dubious distinction between government and a private entity exercising the federal power." *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, No. 01 C 4696, 2002 WL 1160939, at *1 (N.D. Ill. May 30, 2002) ("A developed body of substantive federal law should normally control. But if a mechanical application of some federal standard would lead to an unfair result, then the court should consider adopting a better state law standard or rethink the federal standard. It should not adopt a state law approach that provides a windfall for either condemnor or condemnee. The goal, after all, mandated by the Constitution, is to provide fair compensation."); *cf. E. Tenn. Natural Gas Co. v. 7.74 Acres in Wythe County, Va.*, 228 F. App'x 323, 327 (4th Cir. 2007) (applying "reasonably probable" change of land use test elaborated in a federal condemnation case, *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)); *Columbia Gas Transmission Corp. v. Rodriguez*, 551 F. Supp. 2d 460, 462 (W.D. Va. 2008) (citing *United States v. Powelson*, 319 U.S. 266, 273-74, 63 S. Ct. 1047, 87 L. Ed. 1390 (1943) and *United States v. Petty Motor Co.*, 327 U.S. 372, 377-78, 66 S. Ct. 596, 90 L. Ed. 729 (1946) in determining just compensation).

Furthermore, although the statute at issue in *Georgia Power*, the Federal Power Act, contains a practice and procedure clause similar to that in § 717f(h), *compare* 16 U.S.C. § 814, *with* 15 U.S.C. § 717f(h), the Federal Power Act also "requires the Federal Energy Regulatory Commission to disapprove applications for projects affecting 'the development of any water resources for public purposes [that] should be undertaken by the United States itself.'" *Nat'l R.R. Passenger Corp. v. Two Parcels of Land*, 822 F.2d 1261, 1267 (2d Cir. 1987) (quoting 16 U.S.C. § 800(b)). Thus, whereas private condemnors under the Federal

17

Power Act frequently "act on a local scale," *see id*. at 1267, the Natural Gas Act does not contain such a distinction, and private condemnors under the Natural Gas Act operate on a national scale with federally approved transmission pipelines.  Indeed, Tennessee's 300 Line Project spans 129-130 miles across parts of Pennsylvania and New Jersey.

In light of these considerations, just compensation owed by Tennessee to Fox Hollow will be determined through application of federal law.

## C.     Compensation Owed to Fox Hollow

As indicated, Fox Hollow contends that it is entitled to just compensation in the amount of $300,000.00.  Alternatively, Fox Hollow asserts that it is entitled to damages in the amount of $249,020.72, which consists of $20,000.00 in direct damages, $69,000.00 in indirect damages, $69,860.00 for additional road crossings, $32,000.00 in re-engineering fees, $6,325.72 in timber damages, and $51,835.00 in replanting costs associated with damage to the temporary work space.  Conversely, Tennessee contends that Fox Hollow is entitled to compensation in the amount of $18,100.00, plus pre-judgment interest from the date of the taking at a rate of 0.25%.

In condemnation actions under the Natural Gas Act, "'[i]t is well established that the landowner has the burden of proving the just compensation owed for the condemned property.'" *Millennium Pipeline Co. v. Certain Permanent and Temporary Easements*, 919 F. Supp. 2d 297, 299 (W.D.N.Y. 2013) (quoting *United States v. 33.92356 Acres of Land*, 585 F.3d 1, 7 (1st Cir. 2009)); *Columbia Gas Transmission Co. v. Rodriguez*, 551 F. Supp. 2d 460, 462 (W.D. Va. 2008).  A landowner generally satisfies this burden by "producing competent expert testimony as to the land's value before and after the taking." *Millennium Pipeline*, 919 F. Supp. 2d at 299 (citing *Hardy Storage Co. v. An Easement to Construct*, *etc.*, No. 2:07CV5, 2009 WL 900157, at *3 (N.D. W. Va. Mar. 31, 2009)).

Moreover, in cases such as this involving a "partial taking," "just compensation is

measured by the difference between the market value of the entire holding immediately before the taking and the remaining market value immediately thereafter of the portion of property rights not taken." *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990) (citing *U.S. v. 91.90 Acres of Land, Situate in Monroe County, Mo.*, 586 F.2d 79, 86 (8th Cir. 1978), *cert. denied* 441 U.S. 944, 99 S. Ct. 2162, 60 L. Ed. 2d 1045 (1979)); *see also 13.98 Acres*, 702 F. Supp. at 1116.

In this case, both Drzewiecki and McChesney provided similar testimony as to the amount of direct damages suffered by Fox Hollow as a result of the taking of the Rights of Way. According to Drzewiecki, Fox Hollow sustained direct damages in the amount of $18,100.00, while McChesney testified that direct damages equaled $20,000.00. The appraisers' opinions, however, drastically differed as to whether the expansion of the easement caused indirect or severance damages. While McChesney opined that Fox Hollow sustained indirect damages of $69,000.00, Drzewiecki testified that he had no proof that there were indirect damages as a result of the takings of the Rights of Way and the installation of a second pipeline. Rather, Drzewiecki opined that the indirect damages occurred in 1955 when the first pipeline was placed across the Property.

Pursuant to *Miller*, in cases involving partial takings the landowner's compensation includes "any element of value arising out of the relation of the part taken to the entire tract." *Miller*, 317 U.S. at 376, 63 S. Ct. 276. Restated, "[i]f the value of the remaining land, on a unit basis, diminishes when the condemned parcel is removed from the larger whole, the landowner is entitled to compensation 'both for that which is physically appropriated and for the diminution in value to the non-condemned property.'" *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting *United States v. 33.5 Acres, Okanogan County*, 789 F.2d 1396, 1398 (9th Cir. 1986)). The diminution in value of the remaining property is referred to as severance damages. *See id*.

> However, it is improper to think of severance damage as a separate item of just compensation apart from the before and after valuation of the land.  In a partial taking, the before and after method of calculation automatically incorporates the concept of severance damages.  If fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation.  However, severance damages based wholly on speculation and conjecture are precluded.  The landowner has the burden of proof in establishing the damage.

*United States v. 6.24 Acres of Land*, 99 F.3d 1140 (6th Cir. 1996) (internal citations and quotations omitted); *see also United States v. 91.90 Acres of Land,* 586 F.2d 79, 86 (8th Cir. 1978).

Here, Fox Hollow failed to satisfy its burden of establishing that it suffered indirect or severance damages as a result of the placement of a second pipeline on the Property. At trial, McChesney testified that he did not conduct a paired sales analysis which indicated that there is a difference in value between a property with one easement and a property with an expanded easement with more than one pipeline.  McChesney further testified that he had no data to support the conclusion that there is an additional impact when a second pipeline is imposed on a property that already has a pipeline.  In view of this testimony, McChesney failed to provide factual support for his opinion that $69,000.00 in severance damages resulted from the imposition of a second pipeline on the Property.  Fox Hollow is therefore not entitled to severance damages.  With respect to direct damages, based on the testimony presented at trial, I find that the fair market value of the Property decreased by $20,000.00 as a result of the taking of the permanent easement.

In addition to the decrease in the fair market value of the Property as a result of the taking of the permanent easement, the parties dispute whether Fox Hollow is entitled to additional compensation for damage to the temporary easement.  Prior to Tennessee's possession of the temporary easement during construction, the area was fully wooded and covered with trees.  During construction, however, the trees were removed.  And, at the completion of construction, Tennessee simply graded, seeded, and mulched the temporary

20

workspace without replanting or replacing the removed trees.  While Fox Hollow maintains that it is entitled to the damage caused to the temporary easement, Tennessee contends that it is not obligated to reimburse Fox Hollow for the alterations to the temporary workspace.

I agree with Fox Hollow that Tennessee is obligated to reimburse it for the costs necessary to restore the temporary easement to its pre-taking condition.   Prior to Tennessee's use of the temporary easement for construction, the area was entirely wooded.  However, upon the completion of construction, Tennessee returned the temporary easement to Fox Hollow in a materially altered condition.  This destruction of trees on the temporary easement is tantamount to a taking for which Fox Hollow is entitled to compensation.  Significantly, if Fox Hollow is not compensated for the cost to restore the temporary easement to its pre-taking condition, it will be in a worse position than it would have occupied had the temporary easement never been possessed and used by Tennessee. *See Miller*, 317 U.S. at 373, 63 S. Ct. 276.  Such an outcome would be inconsistent with the concept of just compensation.  Therefore, as the testimony at trial establishes the cost of replanting and restoring the temporary workspace to be $51,835.00, Fox Hollow is entitled to such compensation for the destruction and damage caused by Tennessee to the temporary workspace.[3]

Lastly, Tennessee must pay pre-judgment interest from the date of the condemnation, March 15, 2011, to the date of the judgment. *See, e.g., Hardy Storage*, 2009 WL 900157, at *7.  "No federal law establishes the appropriate procedure for determining what interest rate applies, and district courts may exercise discretion in this area." *Id*. (citing

---

[3]   Fox Hollow will not be compensated for the value of timber removed from the temporary easement.  Compensating Fox Hollow for the timber removed in addition to the restoration and replanting costs would result in a windfall in excess of the compensation necessary to return Fox Hollow to its pre-taking position.

*Washington Metro. Area Transit Authority v. One Parcel of Land in Montgomery Co., Md.*, 706 F.2d 1312, 1322 (4th Cir. 1983)).  Here, Tennessee proposes that pre-judgment interest be calculated pursuant to the federal post-judgment interest statute. *See* 28 U.S.C. § 1961(a) ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.").

In other cases awarding pre-judgment interest, I have relied on the IRS overpayment rates. *See, e.g., Supinski v. United Parcel Serv., Inc.*, No. 06-793, 2012 WL 2905458, at *4 (M.D. Pa. July 16, 2012); *Schlier v. Rice*, No. 04-1863, 2009 WL 5182164, at *2 (M.D. Pa. Dec. 22, 2009); *Lohman v. Duryea Borough*, No. 05-1423, 2008 WL 2697309, at *3 (M.D. Pa. July 1, 2008) (citing *Taylor v. Cent. Pa. Drug & Alcohol Servs. Corp.*, 890 F. Supp. 360 (M.D. Pa. 1995)).  I will do so here as well.[4]

| Time Period | Overpayment Rate | Time | Amount Owed |
|---|---|---|---|
| March 15, 2011- March 31, 2011 | 3% | 17 days | $100.37 |
| April 1, 2011- September 30, 2011 | 4% | 6 months | $1,436.70 |
| October 1, 2011-January 1, 2014 | 3% | 27 months | $4,848.86 |
| January 1, 2014- February 24, 2014 | 3% | 55 days | $324.73 |
| | | **TOTAL** | **$6,710.66** |

Therefore, Fox Hollow is entitled to pre-judgment interest in the amount of $6,710.66.

## IV. Conclusion

For the above stated reasons, Fox Hollow is entitled to recover $20,000.00 for the

---

[4]     For a detailed explanation on calculating interest owed using the IRS overpayment rates, see *Supinski*, 2012 WL 2905458, at *4.

decrease in the fair market value of the Property as a result of the taking of the Rights of Way, $51,835.00 for the cost to replant and restore the temporary workspace to its pre-taking condition, and $6,710.66 in pre-judgment interest.  Accordingly, judgment will be entered in favor of Fox Hollow and against Tennessee in the amount of $78,545.66.  My Findings of Fact and Conclusions of Law are as follows:

### Findings of Fact

1.    Defendant Fox Hollow Estates, L.P. ("Fox Hollow") owns 298.97 acres of real property in Shohola Township, Pike County, Pennsylvania, described in a Deed dated May 23, 2005, recorded in the Office of Recorder of Deeds of Pike County at Book 2112, Page 1341 (the "Deed"), and known as Tax Parcel Numbers 49.00-1-15, 49.00-1-19, 49.00-1-20, and 62.00-01-57 (the "Property").

2.    By way of an agreement granting an easement in 1955 to Tennessee Gas Pipeline Company's ("Tennessee") predecessor, Tennessee Gas Transmission Company, Tennessee owned an easement and right of way on the Property.  That easement is fifty (50) feet wide and grants Tennessee the right to operate and maintain a single pipeline.

3.    Fox Hollow acquired the Property on May 23, 2005 for $1,875,000.00 for purposes of subdividing it and selling free-standing single homes.

4.    Tennessee received a Certificate of Public Convenience and Necessity from the Federal Energy Regulatory Commission ("FERC") on May 14, 2010, Docket No. CP09-444-000, 131 FERC ¶ 61,140 (2010) (the "FERC Order"), to construct new pipeline and compressor facilities and modify existing facilities on its existing 300 Line as part of Tennessee's 300 Line Project (the "Project").

5.    In order to construct the Project, Tennessee required additional permanent right of way and temporary workspace on the Property.

6.    On January 5, 2011, Tennessee filed a Complaint in Condemnation in this action seeking to condemn permanent rights of way and easements, twenty-five (25) feet in width containing 1.732 acres, and temporary easements of 5.413 acres (the

"Rights of Way").

7.     The Rights of Way were obtained to construct, operate, and maintain the pipeline approved in the FERC Order for the Project.

8.     The Rights of Way are adjacent to or co-existing with the existing fifty (50) foot wide easement on the Property, and include an additional permanent right of way and easement of 1.732 acres, temporary workspace and easements of 5.413 acres, and an overlay easement for the new second pipeline in the pre-existing easement area of 1.886 acres.

9.     As part of its application for a certificate of public convenience and necessity for the Project, Tennessee submitted alignment sheets depicting the pipeline construction route.

10.    The Project included the construction of eight pipeline loop segments.

11.    The Property is on the construction route for Loop 323 as reviewed and approved by the FERC.

12.    On February 28, 2011, Tennessee and Fox Hollow entered into a Stipulation Regarding Notice Pursuant to Fed. R. Civ. P. 71.1(e)(1) and Possession (Doc. 17), whereby the parties agreed to the entry of an order granting Tennessee immediate possession of the Rights of Way to construct the project upon the posting of a bond as security for just compensation.  Fox Hollow also reserved "the right to challenge the amount of just compensation being offered by Tennessee and present evidence at the trial on compensation[.]"

13.    On March 4, 2011, the Court entered the stipulated order granting Tennessee possession of the Rights of Way upon the posting of a bond. (Doc. 19.)

14.    Tennessee posted a bond on March 15, 2011 to perfect its right to possession of the Rights of Way. (Doc. 20.)

15.    A certified copy of the March 4, 2011 Order granting was recorded in the Office of the Recorder of Deeds for Pike County, Pennsylvania as Instrument 201300000810 at Deed Book 2409 Page 2512.

16.     As a result of the taking of the Rights of Way, Tennessee's permanent easement and right of way on the Property increased from fifty (50) to seventy-five (75) feet in width and is now subject to two pipelines.

17.     Tennessee submitted an Environmental Construction Plan for Pennsylvania to the FERC as part of its Implementation Plan for construction of the Project.

18.     The FERC reviewed and approved the Environmental Construction Plan for Pennsylvania by issuing a Notice to Proceed with construction in Pennsylvania.

19.     The restoration that Tennessee is required to perform by the FERC on the Property is set forth in the Environmental Construction Plan for Pennsylvania.

20.     After purchasing the lot, Fox Hollow approached Shohola Township to begin discussing development of the Property.

21.     Fox Hollow prepared and submitted major subdivision plans to Shohola Township and Pike County, soil erosion and sedimentation control plans were submitted to the Pike County Conservation District, and sewage testing was performed and planning documents were submitted to the Pennsylvania Department of Environmental Protection.

22.     Fox Hollow has never received preliminary or final subdivision approval for the Property.

23.     Fox Hollow has never received preliminary or final land development approval for the Property.

24.     At the time of the taking, the Property was a vacant lot that was entirely undeveloped and largely wooded.  The Property is currently a vacant lot that is entirely undeveloped.

25.     Tennessee has completed construction of the Project on the Property, and restoration of the temporary easement has been completed.

26.     The fair market value of the Property decreased by $20,000.00 as a result of the taking of the permanent easement.

27.     Prior to Tennessee's use of the temporary workspace, the temporary easement

was covered with trees.

28. Now, the temporary workspace contains no trees.   Instead, the temporary workspace has been restored through grading, mulching, and seeding.

29. 155 trees are needed to replace the trees removed from the temporary workspace.

30. The cost of 155 replacement trees is $6,885.00.

31. To replant a tree on the temporary workspace costs $290.00 per tree.

32. The total cost of replanting the 155 replacement trees on the temporary workspace is $44,950.00.

33. The IRS overpayment rate from March 15, 2011 to March 31, 2011 was 3%.  From April 1, 2011 to September 30, 2011, the overpayment rate was 4%.  And, from October 1, 2011 to the date of judgment, the overpayment rate has been 3%.

### Conclusions of Law

34. In accordance with *United States v. Miller*, 317 U.S. 369, 63 S. Ct. 276, 87 L. Ed. 336 (1943), federal law governs the substantive determination of just compensation in a condemnation action commenced under the Natural Gas Act.

35. "Just compensation," as used in the Fifth Amendment, requires the "equivalent in money of the property taken," as the owner is to be put in the same position financially as he or she would have occupied had the property not been taken. *Id*. at 373, 63 S. Ct. 276.

36. In condemnation actions under the Natural Gas Act, "'[i]t is well established that the landowner has the burden of proving the just compensation owed for the condemned property.'" *Millennium Pipeline Co. v. Certain Permanent and Temporary Easements*, 919 F. Supp. 2d 297, 299 (W.D.N.Y. 2013) (quoting *United States v. 33.92356 Acres of Land*, 585 F.3d 1, 7 (1st Cir. 2009)); *Columbia Gas Transmission Co. v. Rodriguez*, 551 F. Supp. 2d 460, 462 (W.D. Va. 2008).

37. A landowner generally satisfies this burden by "producing competent expert testimony as to the land's value before and after the taking." *Millennium Pipeline*, 919 F. Supp. 2d at 299 (citing *Hardy Storage Co. v. An Easement to Construct*,

26

*etc.*, No. 2:07CV5, 2009 WL 900157, at *3 (N.D. W. Va. Mar. 31, 2009)).

38.     Upon consideration of the testimony presented at trial, I conclude that the fair market value of the Property decreased by $20,000.00 as a result of the taking of the permanent easement.

39.     Although *Miller* provides that in cases involving partial takings the landowner's compensation includes "any element of value arising out of the relation of the part taken to the entire tract," *Miller*, 317 U.S. at 376, 63 S. Ct. 276, Fox Hollow is not entitled to recover indirect or severance damages in this case because it failed to provide a concrete, non-speculative basis to support the conclusion that such damages were suffered as a result of the placement of a second pipeline on the Property. *Cf. United States v. 6.24 Acres of Land*, 99 F.3d 1140 (6th Cir. 1996) ("severance damages based wholly on speculation and conjecture are precluded.").

40.     Fox Hollow is entitled to compensation for the damage caused by Tennessee to the temporary easement.

41.     When Tennessee took possession of the temporary easement, the easement was entirely wooded and covered with trees.  At the conclusion of construction, the trees had been removed, and Tennessee graded, seeded, and mulched the temporary easement without replanting any trees.

42.     Tennessee returned the temporary easement to Fox Hollow in a materially altered, damaged condition.

43.     To be fully compensated, Fox Hollow is entitled to recover the costs associated with replanting and restoring the damaged temporary workspace.

44.     The cost to replant and restore the temporary workspace is $51,835.00.

45.     Fox Hollow is also entitled to pre-judgment interest from the date of the taking to the date of the entry of judgment. *See Hardy Storage*, 2009 WL 900157, at *7.

46.     "No federal law establishes the appropriate procedure for determining what interest rate applies, and district courts may exercise discretion in this area." *Id*.

(citing *Washington Metro. Area Transit Authority v. One Parcel of Land in Montgomery Co., Md.*, 706 F.2d 1312, 1322 (4th Cir. 1983)).

47.   The IRS overpayment rates will be applied to determine the pre-judgment interest owed to Fox Hollow.

48.   Fox Hollow is entitled to pre-judgment interest in the amount of $6,710.66.

49.   Judgment will be entered in favor of Fox Hollow and against Tennessee in the amount of $78,545.66.

50.   Judgment will be entered in favor of Tennessee for the title of the Rights of Way upon payment to Fox Hollow for just compensation.


An appropriate order follows.


February 24, 2014                                    /s/ A. Richard Caputo
Date                                                         A. Richard Caputo
                                                                United States District Judge